**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA ROGERS, on behalf of herself and as mother and next friend of R.R., PATRICIA LEE, and TRIMAINE WILSON, | ) ) ) ) | |
| Plaintiffs, | ) | Case No. 22 CV 530 |
| v. | ) ) | Judge Joan H. Lefkow |
| CITY OF WHEATON and WHEATON POLICE OFFICERS LOSTER, SHEAHAN, BELCASTER, UHLIR, HASAN, and SIRIPANYA, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**OPINION AND ORDER**

Patricia Rogers, individually and as mother and next friend of R.R., Patricia Lee, and

Trimaine Wilson filed this civil rights action against the City of Wheaton, Illinois, and six

Wheaton police officers, alleging constitutional violations related to a January 29, 2020, traffic

stop.[1] Rogers, Lee, and Wilson claim excessive force under the Fourth Amendment against all

officers (Count I). Lee and Wilson also claim false arrest under the Fourth Amendment (Count

II), and Rogers brings a common law malicious prosecution claim against Officers Ed Hasan and

Sonesacksith Siripanya (Count IV). Plaintiffs seek indemnification from the City of Wheaton

(Count III).[2] Before the court is defendants' motion for summary judgment on all claims. (Dkt.

35.) For the following reasons, defendants' motion is granted in part and denied in part.

---

[1] The claim arises under 42 U.S.C. § 1983. The court has jurisdiction under 28 U.S.C. §§ 1343 and 1367. Venue is proper under 28 U.S.C. § 1391(b).

[2] Plaintiffs have voluntarily dismissed their negligent spoliation claim (Count V). (*See* Dkt. 31.)

## FACTUAL BACKGROUND[3]

On the morning of January 29, 2020, Patricia Rogers was stopped in her Dodge Durango at the intersection of Wheaton and Willow Avenues in Wheaton. Her mother, Patricia Lee, was in the passenger seat next to her. Rogers' five-year-old son R.R. and a baby were in the back seat. They were waiting to pick up Rogers' brother, Trimaine Wilson, from his house located nearby. At the time, Rogers was six months pregnant.

Mark Gonzalez pulled up in his vehicle behind the stopped Durango. Angry that plaintiffs were idling at a stop sign, Gonzalez honked his horn, approached the Durango, and knocked on Rogers' window. Lee testified that Gonzalez began "banging on their window and shouting obscenities and invectives." (Dkt. 47 ¶ 4.) Rogers then got out of the Durango with her keys in hand to confront Gonzalez, who had returned to his car. What happened next, the parties dispute. Gonzalez accused Rogers of pulling a knife and tapping it on his window. Rogers testified that she had admitted to officers that she had a pocketknife in her hand but denied that she pulled it on him. Either way, Lee asked Rogers to return to their vehicle.

As Rogers was returning, Gonzalez called 911. He told the dispatcher, "I'm trying to make a left at a stop sign, and I've got a lady who's parked at the stop sign, and I got mad and knocked at her window after beeping the horn, she pulled a knife on me." (Dkt. 38 ¶ 11.) The dispatcher immediately broadcasted Gonzalez's statement, requesting police assistance: "Lady

---

[3] On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it may enforce strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). Accounting for the parties' objections, what follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is because it either was immaterial and provided no helpful context or was unsupported by the evidence.

pulled a knife on complainant in a white Dodge Durango" and stated the vehicle's license plate number. (Dkt. 38 ¶ 18.) Minutes later, after the dispatch, Gonzalez identified the knife as a red pocketknife. No evidence suggests that the dispatcher conveyed this detail to responding officers.

Gonzalez remained on the line with the dispatcher when Wilson entered the Durango and Rogers began driving. The dispatcher directed Gonzalez to follow plaintiffs with his flashers on and asked him to wait in a parking lot to speak with responding officers. Within minutes of Gonzalez's 911 call, Officers Siripanya and Michael Sheahan stopped plaintiffs' vehicle on Roosevelt Road. The stop was recorded as "felony stopped." Officer Hasan directed traffic on Roosevelt Road, as all five lanes of traffic were stopped. Officers Ben Belcaster, Kimberly Loster, and Jill Uhlir arrived moments later because it was considered a "high risk" stop.

Plaintiffs dispute that the stop was in fact a high-risk stop, but the officers followed Wheaton Police Department procedures for a high-risk, or felony, stop because they had been alerted by dispatch that someone in plaintiffs' vehicle possessed a knife and so was potentially dangerous. Accordingly, Sheahan and Siripanya drew their weapons and ordered plaintiffs to display their hands outside of the vehicle's windows. Wilson, who was seated in the back seat with the children, upon seeing the officers' weapons yelled, "There's babies in the car!" (Dkt. 38 ¶ 34.) All officers other than Hasan also drew and displayed their weapons.

Sheahan ordered Wilson to get out of the Durango, "face away from the sound of his voice, place his hands on top of his head, walk backwards towards the officers, kneel, and then lie face down on the street." (Dkt. 38 ¶ 37.) Wilson complied. Siripanya then handcuffed Wilson while Uhlir displayed her weapon to provide cover, and Siripanya placed Wilson in the back seat of a squad car. Then, Wilson was patted down. Next, Sheahan ordered Rogers to exit the Durango and gave her the same order as he gave Wilson. Rogers complied. Loster stood her up

and handcuffed her while Uhlir provided cover. Lee testified that she "was telling them [that Rogers was] pregnant, that you don't put her on the ground." (Dkt. 47-1 at 92.) Once Rogers was in handcuffs, Loster performed a pat down and found a red pocketknife in her coat pocket. Loster then placed Rogers in the back of a different squad car.

Belcaster next ordered Lee to exit the Durango. Belcaster handcuffed her while standing but did not place her in a squad car. Sheahan and Conway,[4] with the assistance of other officers, watched over R.R., who was crying and vomited on himself. Weapons displayed but pointed downward, Sheehan and Lieutenant Ryan Conway completed a 10-to-15-second visual inspection of plaintiffs' vehicle and then holstered their weapons. In sum, the officers had their weapons drawn and displayed from 11:30 when the stop began until 11:39. In addition to their visual inspection, dashcam footage shows officers searching the front and rear passenger compartments as well as an opened trunk. At 11:43, officers moved the Durango and squad cars to an off-street parking lot, where they searched the vehicle a second time.

Wilson asked Siripanya to loosen his handcuff, as he "fe[lt] like [it was] cutting into [his] wrist."[5] Siripanya checked the cuff and responded, "[I]t has enough room." (Dkt. 38 ¶ 55.) Wilson never repeated his request. Wilson testified that he suffered injuries to his hands and wrists, which aggravated injuries to his torn rotator cuff and knee and exacerbated his back pain. He also testified that he was diagnosed with Post-Traumatic Stress Disorder because of this incident and that he suffered from an increase in anxiety and nightmares.

---

[4] Lieutenant Conway was also present at the scene but was not named as a defendant in the lawsuit.

[5] Wilson also testified to telling the officer that "handcuffs was too tight, and it was hurting my shoulder, my back, my knees."

4

Lee and Wilson remained handcuffed in police cars until 11:50 and 11:51 a.m., respectively. In total they were detained for approximately twenty-four minutes. Defendants assert that they released Lee and Wilson after the officers "concluded their investigation." (Dkt. 38 ¶ 54.) Dashcam footage shows that Wilson walked back to the Durango after being released. Wilson approached the Durango where Sheahan was also standing, but Sheahan pushed him away. As Wilson described it, "[w]hen I walked up to my mom van, I didn't know he was in there searching [at] first, and I wanted to, you know, basically at this point kind of sit down, and then he shoved me. I think he like rubbed on me and then shoved me for no reason." (Dkt. 47-1 at 19.) In an affidavit, Sheahan explains:

> I had already completed my search of the driver's side front and back seat areas, and I was in the process of searching the passenger side of the vehicle when I was surprised by Trimaine Wilson having walked up close behind me and next to the open passenger side vehicle doors.
>
> Mr. Wilson's presence standing next to the vehicle during my search was an officer safety issue as I had not yet determined whether any other weapons were present. As such, I immediately perceived Trimaine Wilson's presence as a potential threat, and in response I told him that he was not allowed by the vehicle yet as it was still being searched, while putting my hand out and lightly pushing his left shoulder in order to direct him away from the vehicle so that I could complete the search.
>
> (Dkt. 52-1 ¶¶ 3–4) (internal citations omitted)

Officer Hasan brought Gonzalez to the parking lot. Gonzalez identified Rogers as the individual who had "motioned to [him] with [a] knife[.]" (Dkt. 38-24 at 2–3.) At the police station, Gonzalez prepared a voluntary written statement that Hasan signed and gave to a sergeant:

> I knocked on the window and asked the driver if she was going to move. She went ballistic and started swearing at me. I told her she was parked [at] a stop sign. I got back into my vehicle and honked the horn twice. The passenger exited her vehicle. She came up to my driver side window and motioned for me to get out of my vehicle as she did this I could see her red handled knife in her left hand. As she motioned to me w[ith] the knife the passenger (woman) came and pulled her

away from my truck … . A tall African American male got in the back seat and they pulled away. … She was the driver. African American.

(Dkt. 38-24 at 2.)

Rogers and Lee were also interviewed at the station. During her interview, Rogers admitted to having her pocketknife in her hand but that she did not use it in any way. During her deposition, Rogers testified that she never removed the knife from her pocket and that she had simply changed her story during the interview to say what she felt the officers wanted her to say. After Rogers was released from custody, she sought a medical check-up and testified to suffering from high blood pressure and headaches for the remainder of her pregnancy.

Rogers was charged with one count of misdemeanor aggravated assault. The case was set for trial on August 18, 2021, but Gonzalez did not appear. After the court denied the government's motion to continue, the government voluntarily dismissed the case believing that it could not make its case without Gonzalez's testimony.

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Lord* v. *Beahm*, 952 F.3d 902, 903 7th Cir. 2020) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). On reviewing a motion for summary judgment, the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party – plaintiffs, in this instance. *Parker* v. *Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017). The court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts[.]"

6

*Reinebold* v. *Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) (quoting *Payne* v. *Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

The burden of establishing the "absence of a genuine dispute of material fact" initially falls on the moving party. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries its burden, then the nonmoving party must show a genuine dispute of fact. *Beardsall* v. *CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). If the nonmoving party is unable to "establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial, summary judgment must be granted." *Lesiv* v. *Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (cleaned up).

## ANALYSIS

Broadly stated, to prove a claim of excessive force, plaintiffs must show that an officer used more force than was reasonably necessary to effect an arrest or an investigatory stop "judged from the perspective of a reasonable officer on the scene." *Baird* v. *Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009). To prove that they were falsely arrested, Lee and Wilson must prove that they were arrested (as the law defines it), as opposed to being merely subjected to an investigatory stop. Plaintiffs must establish individual liability with respect to each defendant in an action brought under Section 1983. *Johnson* v. *Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019).

Where, as here, the officers assert a defense of qualified immunity, the burden lies with the plaintiffs to "demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the defendants' conduct was unconstitutional or by presenting evidence that the [d]efendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Est. of Escobedo* v. *Bender*, 600 F.3d 770, 780 (7th Cir. 2010).

The court addresses whether plaintiffs' constitutional rights were violated before turning to the issue of qualified immunity. *See Pearson* v. *Callahan*, 555 U.S. 223, 242 (2009) (courts may decide which element to address first to "best facilitate the fair and efficient disposition of each case.")

## I.  Excessive Force

Plaintiffs contend that the use of force by the officers was excessive under the Fourth Amendment. Defendants deny that they used excessive force against any of the plaintiffs.

### A.  Officer Hasan

Defendants contend that Officer Hasan cannot be liable because he was not personally involved with the conduct alleged to have violated the Fourth Amendment. Plaintiffs make no argument to the contrary. The undisputed facts show that Hasan's role was limited to directing traffic on Roosevelt Road during the stop, transporting Gonzalez to the parking lot, and obtaining a written victim statement from Gonzalez. Because there is no evidence that Hasan used force against any plaintiff, he is entitled to summary judgment on both Fourth Amendment claims.

### B.  Officers Sheahan, Siripanya, Uhlir, Loster, and Belcaster

Plaintiffs contend that the officers were unjustified in pointing their guns at them. The officers respond that their display of weapons was reasonable because they adhered to Wheaton Police Department High-Risk Traffic Stop Procedures, which permit officers to display a shotgun or other assigned weapon to maintain control during high-risk traffic stops and the "potentially volatile situation" in front of them. (Dkt. 36 at 11–12.)[6]

---

[6] Plaintiffs claim that guns were pointed *at* them, the officers say they were displayed in a downward position. At the summary judgment stage, plaintiffs' version is accepted, but it does not affect the outcome.

"[C]ompliance with or deviation from departmental policy doesn't determine whether" officers used excessive force. *United States* v. *Brown*, 871 F.3d 532, 537 (7th Cir. 2017). *See also Thompson* v. *City of Chicago,* 472 F.3d 444, 454 (7th Cir. 2006) (violation of departmental policy is "completely immaterial as to the question of whether a violation of the federal constitution has been established"). As *Brown* cautions, if adherence with a department policy were the appropriate legal standard, then local police departments would improperly become "arbiter[s] of Fourth Amendment reasonableness[.]" 871 F.3d at 537. The issue is whether the officers "used greater force than was reasonably necessary." *Id*. at 536 (quoting *Williams* v. *Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015)).

The proper application of the test for excessive force requires an analysis of the facts and circumstances of the case, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Baird*, 576 F.3d at 344 (quoting *Graham* v. *Connor*, 490 U.S. 386, 39 (1989)). "[W]hile police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Id.* at 346 The level of force that police use while effectuating a search or seizure is reasonable as long as it remains proportional to the threat posed. *See Brown*, 871 F.3d at 536 ("Ultimately the officer flunks … if, in light of the circumstances, he 'used greater force than was reasonably necessary to effectuate the seizure.'" (quoting *Williams*, 797 F.3d at 473)). That said, force that may be reasonable when a suspect first poses a threat may no longer be reasonable later on, for "as the threat changes, so too should the degree of force[.]" *Cyrus* v. *Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010).

Under these principles and based on what the officers learned from the dispatcher that a woman had pulled a knife on another individual, it was reasonable at the outset for the officers to draw their guns to protect themselves and maintain control over the situation until the occupants of the vehicle were determined to be unarmed and the officers' safety was secured. The circumstances are comparable to those in *Williams* v. *City of Champaign*, where a dispatcher reported that a robbery had taken place and that the suspect had left in a minivan with a specific license plate number. 524 F.3d 826, 827 (7th Cir. 2008). Responding officers kept their guns drawn until all the van's occupants had been removed, two occupants were put in handcuffs, and a suspect was placed in a squad car. *Id.* at 828. Although the original caller was later found to have been mistaken, the court concluded that police acted reasonably based on the facts known to them at the time: that a robber was in the vehicle and may have been armed. *Id.* at 828–29.

Plaintiffs stress that "there was nothing inherently dangerous about the stop" and that they complied with officer commands. Whether plaintiffs *in fact* posed a threat to the officers or others, however, is not the question. Even in *Cyrus*, where the Seventh Circuit reversed summary judgment for the defendants, the court commented in dicta that a lieutenant's initial use of force may have been reasonable given his apprehension that the suspect could have retrieved a weapon. 624 F.3d at 863. Under these circumstances, the court finds that the officers did not violate the Fourth Amendment's prohibition against use of excessive force by displaying their guns.

### C. Officer Siripanya

Plaintiffs also contend that Officer Siripanya's refusal to loosen Wilson's handcuffs when requested constituted excessive force. It is true that "[a] person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that

10

person presents little or no risk of flight or threat of injury." *Rooni* v. *Biser*, 742 F.3d 737, 742 (7th Cir. 2014). As plaintiffs point out, courts have on occasion found the refusal to loosen handcuffs to be a violation the Fourth Amendment. In *Payne*, for example, the Seventh Circuit found it unreasonable that arresting officers violently[7] placed handcuffs so tight that they made the plaintiff's hands numb and refused to loosen the cuffs when prompted. 337 F.3d at 774–75, 779. *But see Tibbs* v. *City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (finding no excessive force where officer failed to loosen handcuffs after plaintiff complained only once, never told officers about the degree of pain, and incurred no injury beyond short-term redness in wrists).

Wilson's experience appears closer to that of the *Tibbs* plaintiff. Wilson only complained once of his discomfort when he told Siripanya that the handcuffs were "cutting" into his wrist. Siripanya checked the handcuffs and concluded that they were not too tight. Unlike in *Tibbs*, however, where the plaintiff's only injury was skin redness, Wilson testified that the handcuffs caused injuries to his hands and wrist, aggravated injuries to his torn rotator cuff and knee, and exacerbated his back pain. *See Herzog* v. *Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002) (to constitute excessive force, refusal to loosen handcuffs does not require "a severe element of violence or a threat of violence."). Wilson's testimony is certainly admissible and relevant, but he has provided no medical evidence of his condition before the incident, no treatment history, nor any evidence that fewer than 30 minutes in handcuffs could exacerbate his condition. A jury would likely be skeptical. And the cases upon which plaintiffs rely involve arrestees who were placed in handcuffs for far longer periods of time than Wilson, *see, e.g.*,

---

[7] In *Payne*, "[The officer] grabbed [the plaintiff's] left arm, jerked it into handcuffing position, forced her arm behind her back, slammed the handcuff down on her wrist, jerked her wrist, and tightened the handcuffs until Payne could not feel her hands." 337 F.3d at 774.

*Brooks* v. *City of Chicago*, No. 15 C 3429, 2017 WL 1163881, at *5 (N.D. Ill. Mar. 29, 2017) (at least eight hours), or who sustained additional injuries during their time in custody. *See, e.g.*, *Payne*, 337 F.3d at 775.

Even if Wilson receives the benefit of the doubt as to excessive force, his claim does not survive the qualified immunity defense. Plaintiffs have not pointed to any closely analogous case that would have put Siripanya on notice that he was violating Wilson's constitutional rights by not loosening his handcuffs after one complaint where he did check them before declining to loosen them. Although as the Seventh Circuit stated, "[i]t is difficult in borderline cases to say that a right to be free from a particular degree of force was "clearly established[,]" *Rooni*, 742 F.3d at 743, it is not difficult to conclude here that Siripanya would not have been "alerted to the fact that a constitutional violation was looming." *Id.* As plaintiffs have not met their burden as to the second prong of the qualified immunity framework, Siripanya is entitled to qualified immunity on this claim.

### F. Officer Sheahan

Plaintiffs next claim that Officer Sheahan shoved Wilson without provocation.[8]

Certainly, police officers may not push or shove innocent people unprovoked*, see Clash* v.

---

[8] Defendants argue that plaintiffs improperly introduced this set of facts for the first time in their response to defendants' motion for summary judgment. The Seventh Circuit, however, has abrogated a long-standing blanket rule that "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Schmees* v. *HC1.COM, Inc.*, 77 F.4th 483, 489–90 (7th Cir. 2023) (quoting *Shanahan* v. *City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). Instead "a district court retains discretion to treat new claims presented for the first time in briefing as a constructive motion to amend … apply[ing] the familiar standards governing when leave to amend should be granted[.]" *Schmees*, 77 F.4th 483 at 490.

Accordingly, the court will not strike these "new facts" for several reasons. First, defendants were on constructive notice of these "new" facts, as they were elicited through the course of fact discovery. Second, defendants were able to respond to the merits of plaintiffs' "new" argument in their reply, including through an otherwise late-filed affidavit that disputes plaintiffs' accounting of the incident. (*See* dkt. 51-A.)

*Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996), but "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers[]'... violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson* v. *Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).[9]

At issue is whether Sheahan's use of force was unreasonable under the Fourth Amendment. Once Wilson was released, he walked towards the Durango and approached Sheahan. Sheahan was still searching the passenger side of the car, although Wilson did not recognize that. He intended to sit down in the Durango, but Sheahan misapprehended Wilson's approach as "an officer safety issue" and forcefully pushed him away.[10] Plaintiffs' argument on this claim is brief, as defendants complain, but defendants themselves provide little justification for Sheahan's perception of Wilson. If a jury were to credit Wilson's version of the story, Sheahan's use of force was gratuitous or at least unnecessary and therefore unreasonable. *See Payne*, 337 F.3d at 779 (finding that it was not objectively reasonable for an officer to shove to the ground "a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with []

---

[9] Defendants cite cases deciding excessive force claims under the Eighth and Fourteenth Amendments, under which such claims "cannot be predicated on a *de minimis* use of physical force." *Jackson* v. *Stubenvoll*, No. 16 C 5746, 2022 WL 991950, at *3 (N.D. Ill. Mar. 31, 2022); *DeWalt* v. *Carter*, 224 F.3d 607, 620 (7th Cir. 2000), *abrogated by Savory* v. *Cannon*, 947 F.3d 409 (7th Cir. 2020). Contrary to defendants' contention, the Seventh Circuit does not impose such a physical injury requirement under the Fourth Amendment. *See McAllister* v. *Price*, 615 F.3d 877, 882 (7th Cir. 2010) ("Injury is not an element of an excessive-force claim; rather, it is evidence of the degree of force imposed and the reasonableness of that force.").

[10] Defendants contradict their own timeline of events through an affidavit Officer Sheahan attached to their reply memorandum. Defendants previously state in the briefing and Rule 56.1 submission (*see* dkts. 36; 38 ¶ 54) that they had completed their search before releasing Wilson and Lee. In his late-filed affidavit (dkt. 51-A), however, Sheahan asserted that he was still searching the Durango when Wilson approached. Based on dashcam footage of the incident, the court accepts Sheahan's statement that he was on the passenger side of the Durango, apparently searching within. As a general practice, filing affidavits that create fact issues where there were none in the discovery record is discouraged. *See Bank of Illinois* v. *Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating … issues of fact with affidavits that contradict their prior depositions.").

minor offenses"). On the other hand, if a jury were to find it true that Wilson posed an officer safety issue, then it could find that Wilson inadvertently provoked Sheahan's use of force. The court cannot resolve this credibility dispute at summary judgment.

Sheahan argues that, even if his conduct constituted excessive force, he is entitled to qualified immunity. As stated, "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Payne*, 337 F.3d at 780 (quoting *Clash,* 77 F.3d at 1048). This principle is "clearly established." Because fact issues preclude a finding on whether Sheahan's conduct was constitutionally impermissible, it would be premature for this court to grant qualified immunity at this juncture. For the foregoing reasons, the court denies summary judgment to Sheahan on Count I.

## II.    False Arrest

Plaintiffs argue that the officers (as a group) seized and detained Lee and Wilson without probable cause in that the officers exceeded the permissible scope of a brief investigatory stop, commonly referred to as a Terry stop. *See Terry* v. *Ohio*, 392 U.S. 1 (1968). The officers respond that they had reasonable suspicion to justify their seizures of both Lee and Wilson and that they never arrested either individual.[11]

The Supreme Court defined the scope of a stop based only on reasonable suspicion as follows: if a police officer makes "reasonable inquiries" and nothing dispels his reasonable fear for his or others' safety, the officer may search the outer clothing of the persons to discover

---

[11] In their Rule 56.1 submission, defendants assert that Lee and Wilson admitted that they were never arrested during their stop and subsequent investigation in their depositions. Whether the manner in which the officers executed their investigation converted a *Terry* stop based on reasonable suspicion into an arrest requiring probable cause is, however, a question of law. *Jewett*, 521 F.3d at 824 ("[A]n officer's use of force may escalate to the point where the encounter becomes, *as a matter of law*, a formal arrest.") (emphasis added). Moreover, plaintiffs dispute defendants' statement, so the court does not accept defendants' assertion as admitted for purposes of summary judgment.

weapons which might be used to assault him. *Id*. at 30-31. To justify "the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, [that] reasonably warrant that intrusion" *Id*. at 21. The facts must be judged against an objective standard: "would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id*. Courts may, however, "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering* v. *Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (quoting *Plakas* v. *Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)).

Plaintiffs contend that the detaining Lee and Wilson, who were just passengers in Rogers' vehicle, was "not justified at the inception." Particularly because the dispatcher communicated to responding officers that the armed individual was a "lady," plaintiffs argue that the officers were not justified in detaining Wilson, a man. The Supreme Court has held, however, that the dangerousness of traffic stops "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Maryland* v. *Wilson*, 519 U.S. 408, 414 (1997). Therefore, if an officer's investigatory stop of a vehicle and its driver is lawful, the seizure of the vehicle's occupants is also reasonable. *Arizona* v. *Johnson*, 555 U.S. 323, 327 (2009). The officers make the valid point that, at that time, they had no way of knowing whether any other occupant had a weapon or posed a threat to them.

Because the officers had reasonable suspicion to pull over the Durango and detain Rogers based on information they knew at the time, they were authorized to seize Lee and Wilson as occupants of the vehicle. "What really matters" for this inquiry, however, "is the manner in

which" Lee and Wilson "w[ere] seized and what happened afterward." *United States* v. *Shoals*, 478 F.3d 850, 853 (7th Cir. 2007).

Even when a stop is reasonable at its inception, "an officer's use of force may escalate to the point where the encounter becomes, as a matter of law, a formal arrest." *Jewett* v. *Anders*, 521 F.3d 818, 824 (7th Cir. 2008). Under *Terry*, a stop based on reasonable suspicion should be "a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity." *United States* v. *Vega*, 72 F.3d 507, 515 (7th Cir. 1995) (cleaned up). The stop "must be reasonably related in scope and duration to the circumstances[.]" *United States* v. *Robinson*, 30 F.3d 774, 784 (7th Cir. 1994). But a "seizure becomes an arrest when 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *United States* v. *Ienco*, 182 F.3d 517, 523 (7th Cir. 1999) (quoting *United States* v. *Corral–Franco*, 848 F.2d 536, 540 (5th Cir. 1988)). The law associates seizure with formal arrest "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[.]" *United States* v. *Mendenhall*, 446 U.S. 544, 545 (1980). The "reasonable person" for these purposes is one "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *United States* v. *Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988).

While "using handcuffs generally signifies an arrest," handcuffs may be appropriate when, in consideration of all circumstances, an officer has a legitimate fear that a suspect poses a risk to the officer's safety. *Matz* v. *Klotka*, 769 F.3d 517, 527 (7th Cir. 2014). Nevertheless, plaintiffs correctly point to *Mwangangi* v. *Nielsen*, in which the Seventh Circuit concluded that

16

"it is the 'rare case' in which 'common sense and ordinary human experience convince us that an officer believed reasonably that an investigative stop could be effectuated safely only'" by using handcuffs. 48 F.4th 816, 827 (7th Cir. 2022) (quoting *United States* v. *Glenna*, 878 F.2d 967, 972–73 (7th Cir. 1989)).

In *Matz*, the Seventh Circuit identified the "outer edge" of when it is appropriate for officers to use handcuffs during a stop based on reasonable suspicion. 769 F.3d at 525. There, when officers approached a group of people, including the plaintiff, who was suspected of armed robbery and murder, everyone attempted to flee the scene. *Id.* at 521. Outnumbered, the officers caught the plaintiff, handcuffed him, and placed him in a police vehicle while they completed their investigation. *Id.* The court, albeit cautiously, held that "officers' safety and the dynamic situation they confronted justified using force and restricting [the plaintiff's] movement" during their search. *Id*. at 527.

*Mwangangi* falls at the other end of the spectrum. 48 F.4th at 816. There, officers handcuffed a suspect alleged to have engaged in the offense of impersonating a police officer. 48 F.4th at 826–27. Because the suspect had complied with officer demands and a pat down revealed no weapons or contraband, the Seventh Circuit, affirming the district court, found the officers' use of handcuffs unreasonable. *Id*. at 827. The court noted that the use of handcuffs "seems to have been automatic—a reflexive next step untethered to anything except highly generalized concerns about officer safety." *Id*.

The facts in this case are even weaker than those discussed in *Mwangangi*. As in both *Matz* and *Mwangangi*, the officers arrived on the scene with the understanding that at least one person was potentially armed and posed a threat to safety. But here, unlike the dark and secluded location in *Mwangangi*, these officers in broad daylight confronted a pregnant woman, a woman

17

old enough to be her mother, a baby, a young child, and a man. They made no inquiry of anyone. Their suspicion of a lady with a knife was confirmed when they found a pocketknife on Rogers. This fact would tend to dispel rather than confirm an existing danger from either Wilson or Lee. In response, defendants point to no specific facts other than generalized safety concerns that would suggest that either Wilson or Lee was involved in criminal conduct. At least, a reasonable jury could find, as in *Mwangangi*, the handcuffing was "untethered to concerns about officer safety." 48 F.4th at 827.

Plaintiffs also argue that putting Wilson in the back of a squad car, while handcuffed, was unreasonable under the circumstances. When there is a "justifiable fear for personal safety on the part of the officer[,]" placing a suspect in the back of a squad car does not convert a *Terry* stop into a formal arrest. *United States* v. *Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) (suspect's detention in squad car during *Terry* stop reasonable because suspect posed flight risk, was involved in narcotics distribution, and was associated with a residence known to house drug-trafficking operation). Why the officers needed to put Wilson in the squad car when he complied with the officers' demands, never threatened to flee or cause harm to the officers, and was outnumbered by police at the scene is unclear. *See Jewett*, 521 F.3d at 824 (The question is whether "the surrounding circumstances gave rise to a justifiable fear for personal safety on the part of the officer.") (cleaned up). The facts presented would permit a reasonable jury to find that Wilson and Lee's Fourth Amendment rights were violated.

Alternatively, the officers argue that they are entitled to qualified immunity because plaintiffs have failed to meet their burden to show that the officers violated a clearly established right. As discussed in a case plaintiffs rely on, however, the right to be free from seizure in the absence of probable cause is beyond question. *See Milhouse* v. *Ne. Illinois Reg'l Commuter R.R.*

*Corp.*, No. 16 C 11709, 2019 WL 4573220, at *6 (N.D. Ill. Sept. 20, 2019) (citing *Burritt* v.

*Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015)). *See also Terry*, 392 U.S. at 30–31. Based on

plaintiffs' version of the manner in which the officers detained Lee and Wilson, much of which

was recorded, a reasonable officer would know that he had departed from clearly established

law. As such, the claims of Wilson and Lee for false arrest must be tried before a jury.

## III.    Malicious Prosecution

To prevail on a claim for malicious prosecution under Illinois law, plaintiffs must show

"(1) the commencement or continuance of an original criminal or civil judicial proceeding by the

defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of

probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the

plaintiff." *Moran* v. *Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (quoting *Swick* v. *Liautaud*,

662 N.E.2d 1238, 1242 (Ill. 1996)). The parties dispute the third prong, whether defendants had

probable cause to prosecute and the fourth, whether Gonzalez acted with malice. Probable cause

to prosecute is established at the time when a criminal complaint is filed and is an absolute

defense to state law claims against officers for malicious prosecution. *Williams* v. *Rodriguez*, 509

F.3d 392, 404 (7th Cir. 2007). Under Illinois law, "[p]robable cause is defined as a state of facts

that would lead a reasonably cautious person to believe, or to entertain an honest and strong

suspicion, that the person arrested committed the offense charged[,]" *Beaman* v. *Freesmeyer*,

183 N.E.3d 767, 789 (Ill. 2021) (citations omitted), and is "a purely objective inquiry" in which

"the officer's subjective state of mind and beliefs are irrelevant." *Abbott* v. *Sangamon County,

Illinois*, 705 F.3d 706, 714 (7th Cir. 2013). *See also People* v. *Lee*, 828 N.E.2d 237, 244 (Ill.

2005). Evidence sufficient to support a conviction is not required. *People v. DeLuna*, 777 N.E.2d

581,593 (Ill. App. Ct. 2002).

Defendants point to three pieces of information that they argue established probable cause for a charge of aggravated assault: Gonzalez's voluntary written statement; Rogers' own admissions during her videotaped interview; and the discovery of Rogers' pocketknife. In a witness statement he submitted to officers on the day of the incident, Gonzalez wrote that he knocked on the driver's window of a car stopped in front of him. When he asked the driver if she would move, she "went ballistic and started swearing" at him, got out of her vehicle, and "motioned" for him to get out of his vehicle with a "red handled knife in her left hand." Plaintiffs do not dispute that Gonzalez provided this information to defendants but argue that defendants should have disbelieved Gonzalez's statements, emphasizing that Gonzalez's statements were inconsistent and fueled by racial animus.

Other than Gonzalez's indicating the race of plaintiffs, which may have been tangentially relevant to accurate identification, plaintiffs point to no evidence that Gonzalez held racial animus against Rogers such that officers should have discredited his account. When an alleged victim "supplies the police with the information forming probable cause, there is a presumption that the information so provided is inherently reliable." *Holt* v. *Chicago*, 214 N.E.3d 877, 900 (Ill. App. Ct. 2022). *See also Hernandez* v. *Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006) ("Police are entitled to act on information that may be inaccurate and let the courts determine whether to credit a suspect's claim of innocence.").

At the police station, neither Lee nor Rogers clearly contradicted Gonzalez's statement. Lee admitted that Rogers possessed a red pocketknife, though she did not suggest that Rogers had used it against Gonzalez. And Rogers has since testified that she initially did admit to having a pocketknife. While even a suspect's denial of wrongdoing does not necessarily negate probable cause, *Reynolds* v. *Jamison*, 488 F.3d 756, 762 (7th Cir. 2007), neither Rogers nor Lee denied

Gonzalez's account. Plaintiffs cite *Askew* v. *City of Chicago*, 440 F.3d 894, 895 (7th Cir. 2006), for a statement that the validity of probable cause is questionable where a reasonable officer knows that an accuser holds a grudge or malice towards the alleged suspect, but they do not acknowledge that in a similar "road rage" situation, the court ruled in favor of the officer's initiation of the prosecution. As there, plaintiffs offer no facts known to the officers at the time, however, that Gonzalez was acting with malice. Moreover, the officers had recovered the pocketknife from Rogers at the scene.

The court grants summary judgment to defendants on this claim.

## IV. Indemnification

The City of Wheaton seeks summary judgment on plaintiffs' indemnification claim because, it argues, the officers are not liable for any of plaintiffs' claims. As the court has found that material issues of fact remain on both the excessive force and false arrest claims, the court will not grant summary judgment on the indemnification claim at this time.

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 35) is granted in part and denied in part. On Count I, the court denies summary judgment to defendant Sheahan and grants summary judgment to the remaining officers. On Count II, the court grants summary judgment to Officer Hasan and denies summary judgment to all remaining officers. On Count III, the court denies summary judgment. On Count IV, the court grants summary judgment to all defendants.

This case will be called for status on September 25, 2024 at 9:45 a.m. in courtroom 2201. The parties shall engage in a sincere effort to resolve the remaining issues and be prepared to report on their progress at the status hearing.

Date: August 30, 2024

U.S. District Judge Joan H. Lefkow